NO. 12-02-00134-CR
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
JANIS KAY DUGAN,                                        §                 APPEAL FROM THE THIRD
APPELLANT
 
V.                                                                         §                 JUDICIAL DISTRICT COURT OF

THE STATE OF TEXAS,
APPELLEE                                                        §                 ANDERSON COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Appellant Janis Kay Dugan (“Appellant”) was convicted of aggregated felony theft of
$20,000 or more but less than $100,000 and sentenced to eight years of imprisonment. In five issues
on appeal, Appellant asserts due process and due course of law violations, the inadmissibility of
certain evidence, and factual insufficiency of the evidence to support her conviction. We affirm.
 
Background
            Appellant was the branch secretary/office administrator for the Palestine branch of Ben E.
Keith Company (“BEK”). After approximately nine years of employment, she was terminated on
March 23, 1999 for poor job performance. On that same morning, Craig Woodcook (“Woodcook”),
a BEK internal auditor, arrived at the Palestine branch to take over Appellant’s duties until a
replacement could be hired and properly trained. At the time Appellant was terminated, no one
suspected her of theft.
            When Woodcook went into Appellant’s office, he noticed cash lying out in the office. He
also noticed that Appellant was several days behind on some of her daily work and that one of her
computer reports was not done. He saw “huge” amounts of money listed on certain reports that did
not correspond to the invoices on which the reports were based. Woodcook began searching back
through the branch’s computer records and discovered numerous discrepancies and inconsistencies. 
As a result, he conducted a full examination of the computer records and corresponding paper
invoices back to late 1995 when the present computer system was installed. At the conclusion of
this process, Woodcook concluded that between $120,000 and $125,000 in cash had disappeared
during the period covered by his examination. By indictment filed on May 24, 2001, Appellant was
charged with aggregate theft of 127 separate sums of money from BEK over a three-year period. The
alleged thefts totaled $20,000 or more but less than $100,000, a third degree felony.


 Appellant
pleaded “not guilty,” and a jury trial began on January 24, 2002. 
            The State’s case-in-chief was based on the testimony of Woodcook and Richard Stuffers
(“Stuffers”), the Palestine warehouse manager. The record also includes fourteen volumes of
documents, including invoices, computer records, summaries of BEK records, and Appellant’s bank
records. Woodcook testified that BEK is a food and beer distributor. The Palestine branch sells
about one million cases of beer yearly and has an estimated annual revenue of eleven million dollars. 
The beer is delivered on two types of routes. In a normal delivery route, the retailer places an order
with a salesman, who logs in the order and downloads the information at the warehouse at the end
of the day. An invoice is printed from the BEK computer system, and the order is then pulled from
the warehouse and loaded for delivery the next morning. The retailer pays the driver by cash or
check, as required by the Texas Alcoholic Beverage Commission. At the end of the day, the driver
tallies up his sales, balances his invoices with the payments he received, and deposits the cash and
checks in the bank. The driver then gives his deposit slip and invoices to the branch secretary/office
manager to enter the delivery data into the computer and reconcile the route. The driver notes any
change in a delivery, including the pickup of empty kegs or bottles, on the face of the invoice and
is responsible for any discrepancy between the amount due from and the amount paid by each
customer.
            A second type of route is the hotshot route. When a retailer runs short of a product and calls
the warehouse with an order, the next available driver or employee makes the delivery. The retailer
pays the driver by cash or check. While Appellant was employed at BEK, the drivers gave her the
invoices and cash for the hotshot deliveries. She prepared a deposit for the route and then logged
the information into the computer to reconcile the route and close the records each day on that day’s
deliveries. Reconciliations for both types of routes occurred daily. Once the routes were closed, the
data entered could not be changed. Appellant made ninety per cent or more of the hotshot deposits
during the years 1996, 1998, and 1999.


 
            Woodcook explained that the thefts occurred through the manipulation of computer records
relating to the hotshot route. He testified that BEK sells kegs of beer to bars and restaurants and that
$12 of the price of a keg is a deposit on the keg container. A retailer who returns an empty keg to
a driver is given a $12 credit against the amount due on his new delivery. When a credit is issued
for a keg return, the driver writes on the ticket the number of kegs picked up and writes the amount
of the credit on the ticket as well. The changed original stays with the retailer and the carbon is
returned to the warehouse. Woodcook’s examination of the computer records revealed that there
were multiple computer entries that differed from the actual invoices. Specifically, he found that
additional empty keg returns were added on the computer for those invoices (with corresponding $12
credits), and that for those routes there was a corresponding amount of cash missing from the deposit
slips prepared by Appellant. Woodcook testified that over the time period in question, BEK sold
12,160 kegs to the customers named in the invoices. However, according to the numbers on the
invoices, BEK picked up 16,816 empty kegs, or approximately 4,600 more kegs than were sold. 
According to his calculations, entry of that many extra empty kegs on the computer records over the
time period in question would be enough to cover up thefts totaling over $50,000.
            Appellant was the only employee consistently involved in each irregular transaction. The
cash was missing from the hotshot route, which used several different drivers and on which
Appellant made the bank deposits. In some occurrences of missing cash, amounts were entered on
the computer for an overpayment by a retailer on one day, but the entry would disappear from the
computer a day or two later. Woodcook testified that Appellant was the only one at the Palestine
branch who had access to that area of the computer and the knowledge to manipulate the data.


 He
eliminated the branch managers as suspects because none of them were there over the entire period
and none of them had the necessary knowledge and access to the computer records. Woodcook
eliminated Stuffers as a suspect because he had access to enter invoices, but not to reconcile routes. 
The drivers did not have computer access or training to reconcile the routes.
            The indictment alleges that the 127 separate incidents comprise “one scheme or continuing
course of conduct of theft.” For each of the 127 occasions in question, Woodcook prepared a file
for the jury, including (1) the paper invoice from the delivery, (2) the deposit slip prepared by
Appellant, (3) a timesheet reflecting Appellant’s presence at work, and (4) summary pages prepared
by Woodcook showing the invoice amount, deposit amount, and reason for the discrepancy. 
            Stuffers confirmed that “nine out of ten times” the drivers left hotshot invoices and cash with
Appellant, or on her desk if she had left for the day when the drivers returned, and that Appellant
deposited the money. Stuffers does not know how to reconcile a route or how to make invoice
changes in the computer. He always thought there were minor discrepancies between the number
of empty kegs shown on the computer records and his physical inventory. The discrepancies became
very “unreasonable” during the period from 1996 to 1999, but leveled off after Appellant left.
            Appellant’s husband, Garry Dugan (“Dugan”), described the couple’s financial history. 
According to Dugan, he and Appellant frequently borrowed from credit cards and also borrowed
from Dugan’s parents. They often had NSF checks and paid overdraft fees. The State introduced
the couple’s bank records into evidence, which revealed that they sometimes paid several hundred
dollars a month in overdraft fees while making multiple non-payroll deposits. They also made
multiple withdrawals for cash, both on deposits and through checks written for cash. Many of the
non-payroll deposits were in cash. Dugan explained that he was unable to identify the source of
most of these deposits because Appellant was the family bookkeeper. However, he testified that they
had non-payroll income and testified about the possible sources of the deposits. Appellant testified
and provided explanations for all but $3,000 of the deposits in question. She admitted that she had
no documentation to support her explanations of the non-payroll deposits. 
            On rebuttal, Woodcock testified that the total deposits to Appellant and Dugan’s bank
account were $206,848.60, and the total payroll deposits were $132,325.28, for a difference of
$74,000.00.
            On January 30, 2002, the jury found Appellant guilty on 126 of the 127 thefts alleged. 
Appellant elected to be sentenced by the trial court. The trial court rejected a negotiated sentencing
agreement and, on April 4, 2002, assessed Appellant’s punishment at eight years of imprisonment. 
Appellant filed a motion for new trial on April 29, 2002, which was overruled by the court on June 3,
2002. This appeal followed.
 
Judicial Involvement in Plea Negotiations
            In her first and second issues, Appellant argues that the trial judge violated her rights to due
process and due course of law under the United States Constitution and the Texas Constitution by
(1) denying her right to a “fair and impartial tribunal” and (2) “placing a price on her right to appeal.” 
Specifically, Appellant complains that the trial judge “initiated [plea] negotiations by making an
offer to Appellant of two years [the minimum term of imprisonment for a third-degree felony],
conditioned on her waiver of her right to appeal.” According to Appellant, she rejected the “offer”
because she did not wish to give up her right to appeal. The trial court then assessed an eight-year
sentence, “despite no evidence offered by the State in the punishment hearing, nor any evidence of
prior convictions . . . ” 
            Although Appellant cites to the Texas Constitution in her first issue, she does not provide
any separate argument or authority explaining how the protections offered by the Texas Constitution
differ from the protections guaranteed by the United States Constitution. Likewise, Appellant does
not argue that the Texas Constitution sets out a different or higher standard than the federal
constitution. Consequently, the state claims raised in Appellant’s first issue are waived, and we
review only the federal claims presented in that issue. See Moore v. State, 935 S.W.2d 124, 128
(Tex. Crim. App. 1996); Lawton v. State, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995). As to
Appellant’s second issue, we review both her federal and her state claims.
The Record
             At a hearing on March 8, 2002, the State and Appellant informed the trial court that they had
reached an agreement providing, in part, for a ten-year probated sentence and $24,000 in restitution. 
In return, Appellant would waive her right to appeal. During his consideration of the agreement, the
judge stated that he had “given a lot of thought to this case, a whole lot more than any case I can ever
remember.” 
            After describing the personal difficulty of having to sentence Appellant because he “grew up
with these people,” the judge elaborated at length on his concerns about the case. He described the
evidence at the guilt/innocence stage as “overwhelming” and pointed out that the thefts had occurred
over several years. He also observed that “a lot of money [had been taken].” He described Appellant
as being “sorry [she] got caught” and “indifferen[t] to the gravity of what was coming her way.” He
went on to explain that if before trial the parties had come to him with a plea bargain for probation,
he might have taken it. However, due to the overwhelming evidence and what he perceived as
Appellant’s lack of concern, he rejected the agreement. He assured the parties that he had not made
a decision on punishment because he had not heard evidence on that issue. The judge requested an
in-depth presentence investigation (“PSI”) and reset the punishment hearing. He then stated that
“[t]he only pressure I feel is my own. And I don’t know, the 25th [the new date for the punishment
hearing], I may grant probation, I don’t know, maybe I need to sleep on it again . . . [Appellant’s
counsel], you’ve sat here before, I think you know what it’s like.”
            On April 4, 2002, the punishment phase continued. The State rested on punishment after
asking the court to take judicial notice of the evidence elicited in the guilt/innocence phase and the
PSI. Appellant’s counsel made various comments about the PSI and then informed the court that
he wanted to put several matters on the record. He first described a meeting in the trial judge’s office
following the March 8 hearing. Appellant’s counsel and the district attorney were both present. At
that time, the judge advised the attorneys that he was willing to accept two years of imprisonment
if Appellant would waive her right to appeal. Counsel advised the judge that he would have to
confer with Appellant, but that he already knew she would not be willing to give up her right to
appeal if any prison time was assessed.
            Counsel next related that in mid-March, while in court on another matter, counsel advised
the judge that Appellant would waive an additional PSI and proceed with sentencing. The judge
asked if counsel would be handling the appeal, and he responded that she would need appointed
appellate counsel.
            In continuing his statement, counsel referred to another incident on March 31 in which 
 
the District Attorney . . . advised me in a telephone conversation that your Honor . . . wanted
[Appellant] to give up her right to appeal if she was to get two years in the penitentiary and then if she
would not waive her right to appeal that he might give her a longer sentence once he read the
presentence report.


In response, the judge explained at length that his intent at the March 8 meeting was to express that
he was “willing to take a two-year sentence that day and in the near future if she would waive
appeal.” He again assured the parties that he had not made up his mind about sentencing because
he was waiting for the hearing and the PSI.
            The judge also stated that he discussed the PSI in a meeting with the community supervision
officer and the district attorney. The conversation occurred because the officer expressed concerns
about meeting the deadline for completing the PSI. The judge denied that he had discussed the
evidence and the facts of the case at that meeting. However, he confirmed that he had asked the
district attorney to call Appellant’s counsel about when the punishment hearing would take place. 
He also asked someone to correct him if he was wrong about the substance of the conversation.
            After the parties discussed the preparation of the new PSI, the court clarified as follows:
 
              Well, I don’t think it’s inappropriate for the Court, in a plea bargain situation, to tell both
parties what I would accept. I think that was sort of the gist of that meeting in my office was, if we
could move this case on and get it disposed of for everyone’s benefit, what it would take because I
have refused a plea bargain. And I wasn’t negotiating. I was telling you what I would take that day. 
Whether she accepted it or not was between she and you. But we weren’t making bargains.


            Appellant did not present any evidence at the hearing, and the State urged the court to
“impose punishment in course with the seriousness of this crime.” Appellant’s counsel argued that
if the trial court assessed imprisonment, two years would be appropriate. During the course of his
argument, Appellant’s counsel commented that he would not expect the court to “punish [Appellant]
because she insisted on appealing the case.” The judge responded that “I’ve never wanted anyone
to give up any right . . . I never intended to deny her rights to do anything. It was hers to accept or
reject. She rejected it.” The judge again urged that “[i]f there’s anyone here that differs with that
interpretation or what interpretation of the event, I wish they would say so right now.”
            The trial court recessed briefly to study the new PSI. When the hearing resumed, the court
sentenced Appellant to eight years of imprisonment. On April 29, 2002, Appellant filed a motion
for new trial and a motion to recuse the trial judge. Both motions alleged that Appellant’s eight-year
sentence resulted from the trial judge’s bias and prejudice toward Appellant and that, as a result,
Appellant had been denied her right to a fair and impartial tribunal. Both motions were denied after
hearing.
Fair and Impartial Tribunal
            “Plea bargaining is the process by which the defendant in a criminal case relinquishes his
right to go to trial in exchange for a reduction in charge and/or sentence.” Perkins v. Third Court
of Appeals, 738 S.W.2d 276, 282 (Tex. Crim. App. 1987) (citations omitted). A trial judge cannot
participate in plea discussions prior to an agreement being reached between the defense and the
prosecution. See, e.g., Perkins, 738 S.W.2d 276, 282; State v. McDonald, 662 S.W.2d 5, 8-9 (Tex.
Crim. App. 1983). The reason is that the trial judge should always avoid the appearance of any
judicial coercion or prejudgment of the defendant since such influence might affect the voluntariness
of the defendant’s plea. Perkins, 738 S.W.2d at 282. In the instant case, the agreement pertained
to sentencing only and was negotiated after a guilty verdict. However, Appellant contends that the
prohibition of judicial involvement in plea discussions is equally applicable and prohibited the trial
judge from telling the parties what sentence would be acceptable to him.
            The cases cited by Appellant relate to judicial involvement in a traditional plea
agreement—one in which the benefit to be conferred by the defendant is a guilty plea. Appellant
cites no case, and we have found none, addressing judicial involvement in post-conviction
sentencing discussions. Furthermore, at this stage of the proceeding, the voluntariness of a guilty
plea is not a concern. Consequently, we decline to adopt a rule that prohibits a trial judge, after
rejecting a post-conviction sentencing agreement, from informing the parties what negotiated
sentence would be acceptable. 
            Even if we were to conclude that the trial judge’s involvement here was improper, the result
would not change. A court’s participation in a plea negotiation is only error if it influences the plea. 
Wright v. State, 776 S.W.2d 763, 767 (Tex. App.—Corpus Christi 1989, pet. ref’d). If an appellant
does not change her plea, any participation by the court is harmless. See id. Appellant did not want
to waive her right to appeal and therefore did not agree to the minimum sentence acceptable to the
judge. Therefore, any error resulting from the trial judge’s involvement is harmless. Appellant has
shown no federal due process violation. Accordingly, Appellant’s first issue is overruled.
Judicial vindictiveness
            Appellant contends that the trial judge assessed an eight-year sentence to punish her for
refusing to waive her right to appeal. The seminal case on judicial vindictiveness is the Supreme
Court’s decision in North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656
(1969). In Pearce, the Court held that vindictiveness against a defendant for having successfully
challenged his first conviction must play no part in the sentence he receives after a new trial. Id.,
395 U.S. at 725, 89 S. Ct. at 2080. If, after a reversal and remand, the trial judge imposes a sentence
more severe than the one he originally assessed, the reasons for his doing so must affirmatively
appear in the record. Id., 395 U.S. at 726, 89 S. Ct. at 2081. However, the case at hand does not
involve a successful appeal and reconviction. Therefore, the presumption of vindictiveness does not
arise, and Appellant must prove actual vindictiveness. See Alabama v. Smith, 490 U.S. 794, 799-00,
109 S. Ct. 2201, 2205, 104 L. Ed. 2d 865 (1989) (where Pearce presumption inapplicable, burden
remains on defendant to prove actual vindictiveness). 
            To prove the trial court’s vindictiveness, Appellant points to the telephone conversation
between her trial counsel and the district attorney relating to the sentence she might be assessed if
she did not waive her right to appeal. However, the record reflects that at the punishment hearing
and again at the recusal hearing, the trial judge denied that he had a conversation with the district
attorney or anyone else, after the March 8 meeting, pertaining to Appellant’s possible sentence. The
district attorney did not testify at the recusal hearing. Throughout the proceedings following
Appellant’s conviction, the judge consistently maintained that he had not reached a decision on
punishment. Furthermore, he characterized any statements the district attorney may have made
regarding the possible length of Appellant’s sentence as “speculation” and reiterated that he did not
make up his mind about Appellant’s sentence until the conclusion of the punishment hearing. 
Simply put, the record contains no evidence (1) that the district attorney and the trial judge engaged
in an ex parte communication concerning Appellant’s sentence or the possible imposition of a longer
sentence upon review of the PSI; (2) that the district attorney’s comments to Appellant’s counsel
reflected the sentiments of the trial judge; or (3) that the district attorney’s statements to Appellant’s
counsel constituted anything more than an attempt to induce Appellant to accept the two-year
sentence by reminding her counsel of the risk of the unknown.
            As further support for her argument, Appellant relies on the fact that the State introduced no
evidence at the punishment hearing. However, the trial court took judicial notice of the evidence
elicited at the guilt/innocence phase. At the March 8 hearing, the judge characterized this evidence
as “overwhelming,” noted that a large amount of money had been taken, and unfavorably described
Appellant’s demeanor. He further stated that a number of things about the case left him “cold.” In
subsequent proceedings, the judge explained that he thought accepting an agreement for a two-year
sentence would be to everyone’s benefit because it would result in a prompt disposition of the
matter. However, he consistently maintained that he did not reach a decision about sentencing until
he saw the PSI. We see nothing in the judge’s comments to assure the parties that he thought the
case warranted the minimum term of imprisonment. In fact, his comments could reasonably be given
a contrary interpretation.
            We also note that prior to imposing sentence, the trial court reviewed the PSI. The rules of
evidence do not apply to a PSI. Fryer v. State, 68 S.W.3d 628, 631 (Tex. Crim. App. 2002). 
Moreover, it has been acknowledged that even rumors can be included in a PSI. See Nunez v. State,
565 S.W.2d 536, 539-40 (Tex. Crim. App. 1975) (Onion, P.J., concurring). The PSI in this case is
not included in the record. Therefore, Appellant is unable show that the PSI contains no information
that would support her sentence.
            Based upon our review of the record, we conclude that Appellant has failed to prove that her
eight-year sentence resulted from judicial vindictiveness. Therefore, she has shown no federal due
process violation. Texas courts have not interpreted the Texas Constitution to provide a defendant
asserting judicial vindictiveness any greater protection than that afforded under the United States
Constitution. See Wiltz v. State, 863 S.W.2d 463, 466 n.5 (Tex. Crim. App. 1993). Consequently,
Appellant has also failed to show a state due course of law violation. Appellant’s second issue is
overruled.
 
 
Extraneous Offenses
            In her third issue, Appellant contends that the trial court erred in the guilt/innocence phase
of the trial by admitting evidence of her marijuana use. In her fourth issue, she argues that the trial
court erred in the guilt/innocence phase by admitting evidence of specific instances of misconduct 
in her former employment.
Standard of Review
            We review claims challenging the admission of evidence of extraneous offenses for an abuse
of discretion. Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). We will affirm the trial
court’s decision if it is within “the zone of reasonable disagreement.” Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh’g). 
            The erroneous admission of an extraneous offense is not constitutional error. See, e.g., Peters
v. State, 93 S.W.3d 347, 354 (Tex. App.—Houston [14th Dist.] 2002, pet. ref’d); Phelps v. State,
999 S.W.2d 512, 520 (Tex. App.—Eastland 1999, pet. ref’d). Therefore, we are to disregard the
error unless it affects Appellant’s substantial rights. Tex. R. App. P. 44.2(b). A substantial right is
affected when the error had a substantial and injurious effect or influence on the jury’s verdict. King
v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In assessing the likelihood that the jury’s
decision was adversely affected by the error, we consider everything in the record, including any
testimony or physical evidence admitted for the jury’s consideration, the nature of the evidence
supporting the verdict, the character of the alleged error, and how the error might be considered in
connection with other evidence in the case. Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App.
2002); see also Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We may also
consider the jury instructions, the State’s theory and any defensive theories, closing arguments, and
even voir dire, if applicable. Motilla, 78 S.W.3d at 355-56; see also Morales, 32 S.W.3d at 867.
Applicable Law 
            As a rule, an accused may not be tried for some collateral crime or for being a criminal
generally. Tex. R. Evid. 404(b); Williams v. State, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983). 
In other words, evidence of other wrongful acts is not admissible to prove the character of the person
to establish that he acted accordingly and committed the offense alleged. Montgomery v. State, 810
S.W.2d at 386; Lazcano v. State, 836 S.W.2d 654, 657 (Tex. App.—El Paso 1992, pet. ref’d). 
However, an extraneous offense may be admissible to prove motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident. Tex. R. Evid. 404(b); Montgomery,
810 S.W.2d at 387; Lazcano, 836 S.W.2d at 756. Extraneous offenses are also admissible to rebut
a defensive theory. Yohey v. State, 800 S.W.2d 232, 236 (Tex. App.—San Antonio 1990, pet. ref’d). 
By raising a defensive theory, the defendant opens the door for the State to offer rebuttal testimony
regarding an extraneous offense if the extraneous offense has common characteristics with the
offense for which the defendant is on trial. Jones v. State, 119 S.W.3d 412, 421 (Tex. App.—Fort
Worth 2003, no pet.); Roberts v. State, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000,
pet. ref’d).
Evidence of Drug Use
            During its cross examination of Dugan, the State informed the trial court that it wanted to ask
about Appellant’s drug and alcohol use. The State also informed the court of a positive test for
marijuana, which is included in Appellant’s personnel file. The trial court sent the jury out and heard
evidence and arguments on the matter. 
            After a short recess but before the jury returned, Appellant’s counsel informed the court as
follows:
 
I do not object to asking him or making inquiry about their use of drugs or alcohol and specifically
about her use of drugs or alcohol. But I do object to any proof by question or otherwise about a
specific act because I think that there was one test that was given at Ben E. Keith and that she failed
it one time in nine years, for marijuana . . . Wide open field with regard to whether or not their monies
were being used for drugs or alcohol. But to go into a specific instance that’s our objection.


The State then took the witness on voir dire. When asked whether he had ever seen Appellant smoke
marijuana any time in her life, Dugan answered that “if somebody had a joint she might take a hit,
but I’ve never seen her purchase anything.” He also stated that Appellant was not buying illegal
drugs, but acknowledged that she had failed a drug test for marijuana while she worked at BEK. The
State contended the failed drug test was admissible evidence of motive and proper rebuttal of a
defensive theory. Appellant’s counsel restated his objection to admission of the test results before
the jury. The trial court overruled the objection.
            The complaint raised on appeal must comport with the objection at trial. Wilson v. State,
71 S.W.3d 346, 350 (Tex. Crim. App. 2002). If it does not, the complaint is waived. Id. Here,
Appellant’s counsel objected to the admission of the test results, but affirmatively stated that he had
no objection to questions concerning Appellant’s drug or alcohol use. On appeal, Appellant argues
that “the trial court erred in admitting evidence of Appellant’s marijuana use.” Consequently,
Appellant has preserved nothing for our review. Appellant’s third issue is overruled.
Evidence of Misconduct in Former Employment
            Appellant complains that the trial court permitted questioning pertaining to bad acts she
committed while working for employers other than BEK. Specifically, Appellant points out that
during its cross examination, the State questioned Appellant concerning the following matters:
 
            1.           That Appellant did not tell the City of Palestine her real qualifications.
              2.           That Appellant was fired from the City of Palestine.
              3.           That Appellant was fired from Harry Brown because she wasn’t truthful on her application.
              4.           That Appellant was fired from Harry Brown because [she] didn’t tell them the truth of what happened
at the City of Palestine.


The State then requested permission to question Appellant about why she was fired from the City
of Palestine. A bench conference ensued, and Appellant’s counsel objected to the proposed
testimony on the grounds that (1) “they have not crossed the threshold to be able to show extraneous
offenses” and (2) “he wants an innuendo of extraneous offense.” The court overruled the objection
stating, “She exposed herself when she takes the stand.”
            To preserve a complaint for appellate review, the record must show that the complaint was
made to the trial court by a timely and specific objection. Tex. R. App. P. 33.1(a)(1)(A). To be
timely, an objection must be raised “at the earliest opportunity,” or “as soon as the ground of
objection becomes apparent.” Johnson v. State, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990)
(citations omitted). “Usually, in the taking of testimony of a witness[,] an objection is apparent as
soon as the question is asked, since the question is likely to indicate that it calls for inadmissible
evidence. Then counsel must, if opportunity afford, state his objection before the witness answers.” 
Girndt v. State, 623 S.W.2d 930, 935 (Tex. Crim. App. 1981) (citing McCormick on Evidence § 52
(1972 ed.)). Moreover, the issued raised on appeal must correspond to the objection made at trial. 
Wilson, 71 S.W.3d at 350.
            Here, Appellant’s counsel objected to the form of the question when Appellant was asked
about her truthfulness on the application she submitted to Harry Brown. Counsel also objected to
the relevance


 of “these employments” after Appellant had answered several questions about the
truthfulness of the resume and application she submitted to the City of Palestine and to Harry Brown. 
Because the State had already elicited the challenged testimony prior to Appellant’s objections, her
objections were untimely. See Girndt, 623 S.W.2d at 935. Additionally, Appellant’s objection to
the form of the question regarding the application she submitted to Harry Brown does not correspond
to the issue presented on appeal. Consequently, Appellant has waived any complaint on appeal
pertaining to the complained-of conduct.
            Appellant also argues that the trial court erred in permitting the State to question Appellant
about why she was fired from the City of Palestine. More particularly, the State elicited testimony
that Appellant was confronted with discrepancies in an account, that she had written a check for cash
to the City that was dishonored by the bank, and that she resigned over the hot check. Appellant
contends that the admission of this testimony violates Texas Rule of Evidence 404(b). The State
disagrees contending that the testimony is merely a clarification of the employment information that
Appellant had already given during direct examination. We will assume, for purposes of argument,
that the admission of this testimony was error and conduct a harm analysis.
            Appellant maintains that the admission of the challenged evidence was harmful because her
credibility was crucial to her defense. Therefore, her argument continues, the fact that she “was
allowed to be pilloried with inadmissible extraneous bad acts” destroyed her credibility with the jury.
This in turn influenced the jury not to accept Appellant’s explanation, provided without
documentation, that other people had access to the funds and that her bank deposits reflected her
income as well as her husband’s income from various non-payroll sources. 
            We first note that the evidence of Appellant’s guilt is overwhelming. In meticulous detail,
Woodcook described the investigation he conducted. He explained that Appellant was the only
employee consistently involved in each transaction. He also testified that Appellant was the only
person at the Palestine branch who had the training, knowledge, and computer access necessary to
manipulate the data. During his testimony, he produced a file for each of the 127 counts alleged in
the indictment. Each file included (1) the paper invoice from the delivery in question, (2) the deposit
slip prepared by Appellant, (3) a timesheet reflecting Appellant’s presence at work, and (4) summary
pages prepared by Woodcook showing the subject invoice, deposit, and reasons for the discrepancy.
            The State also introduced Appellant’s bank records, which revealed that Appellant and her
husband sometimes paid several hundred dollars a month in overdraft fees while making multiple
cash, non-payroll deposits. The records also showed multiple withdrawals for cash from deposits
and through checks written for cash. In contrast to Woodcook’s presentation, Dugan and Appellant
each testified about their various sources of income and loans, but produced no supporting
documentation or witnesses. Appellant also testified that the thefts could have been committed by
others or could have been the result of driver error. However, Woodcock’s analysis accounted for
driver error, and Appellant introduced no evidence challenging Woodcock’s calculations. Moreover,
Appellant introduced no evidence that anyone else had the required knowledge and computer access
to commit the thefts.
            Additionally, Appellant’s testimony concerning the “financial irregularities” at the City of
Palestine comprises only ten of approximately six hundred pages of trial testimony. The State’s
closing argument, including rebuttal, encompasses twenty-five pages. The prosecutor asked the jury
to consider the credibility of Appellant against the credibility of those who would have nothing to
gain by their testimony. He also recounted her testimony concerning the misstatement on her resume
concerning her educational level, her termination from the City of Palestine for “financial
irregularities,” her termination by Harry Brown when he learned about her history at the City of
Palestine, the couple’s failure to declare their additional income on their federal income tax return,
and Appellant’s falsification of her time records at BEK. The reference to the “financial
irregularities” at the City of Palestine is only one sentence and is no more damaging than references
to the other “bad acts” that were mentioned. Furthermore, the prosecutor’s argument pales in
comparison to the quantum of evidence presented by the State and the absence of any controverting
witnesses or documentation by Appellant. Therefore, based upon our consideration of the relevant
factors and our review of the record, we conclude that if the introduction of the challenged testimony
was error, the error was harmless. Appellant’s fourth issue is overruled.
 
Factual Sufficiency of the Evidence
            In her fifth and final issue, Appellant maintains that the evidence is factually insufficient to
support her conviction.
Standard of Review 
            When reviewing the factual sufficiency of the evidence, we consider whether a neutral review
of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so
obviously weak as to undermine confidence in the jury’s determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof. Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000). We set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996). In conducting this analysis, our duty is to examine the trier of
fact’s weighing of the evidence. Johnson, 23 S.W.3d at 7. We consider all of the evidence in the
record related to an appellant’s sufficiency challenge, comparing the weight of the evidence that
tends to prove guilt with the evidence that tends to disprove it. See id. However, because the jury
is the sole judge of the facts, we must give deference to jury findings. Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997). What weight to give contradictory testimonial evidence is within
the province of the jury because it turns on an evaluation of credibility and demeanor. Id. at 408-09. 
The jury may choose to believe some testimony and disbelieve other testimony. Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). 
Analysis 
            Appellant does not challenge the legal sufficiency of the evidence. To support her factual
sufficiency argument, Appellant points to the following evidence that is favorable to her: (1) the
company computers were networked company wide; (2) others at the branch had access to the
computers, and people at the corporate office had access to Palestine records; (3) other people knew
Appellant’s password; (4) the route drivers often forgot to put keg returns on the invoices; (5) other
people had stolen money from the company; (6) Appellant provided an explanation for the extra
funds deposited into the account she shared with Dugan; and (7) the evidence showed she was not
always at the office during the hours shown on her timesheet.
            Woodcook testified that although others at the branch had access to the computers and knew
Appellant’s password, no one else knew how to perform the route reconciliations that are integral
to the transactions in question. Furthermore, once Appellant logged in on her computer at
approximately 8:30 each morning, no one else could log in using her password. The routes were
reconciled daily. Once a route was closed, the data entered could not be altered. In short, even if
others knew how to manipulate the data and had the required access, there was little or no
opportunity to do so because of the features of the system and the number of hours that Appellant
was logged in each day. 
            Woodcook recognized the possibility of driver error and accounted for any such error in his
summary of each transaction. Appellant provided no documentation to support her explanation of
the non-payroll funds deposited into her account. Moreover, the pattern of multiple deposits, some
of which were on the same day or on consecutive days, NSF checks, and cash withdrawals is
inconsistent with her explanation that the additional monies were from extra jobs, credit card
advances, and loans from family members. Appellant presented no evidence to refute any of the
timesheets included in the transaction files prepared by Woodcook. Finally, she did not controvert
the number of driver errors Woodcook calculated. Therefore, based upon our review of the record,
we conclude that the proof of guilt is not so obviously weak as to undermine confidence in the jury’s
determination, nor is the proof of guilt, although adequate if taken alone, greatly outweighed by
contrary proof. Consequently, we hold that the evidence is factually sufficient to support Appellant’s
conviction. Appellant’s fifth issue is overruled.
 
Conclusion
            Having overruled the five issues presented by Appellant on appeal, we affirm the judgment
of the trial court.
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
Opinion delivered April 21, 2004.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
(DO NOT PUBLISH)